UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CANDACE GERTCHER,

    Plaintiff,

v.

                                    Case No. 2:20-cv-240

JASON THERRIAN,                      Hon. Hala Y. Jarbou

    Defendant.
_____/

## OPINION

Plaintiff Candace Gertcher sues Officer Jason Therrian for allegedly violating her Fourth Amendment rights. She claims that he used excessive force when arresting her at her home. Before the Court is Gertcher's amended motion for default judgment (ECF No. 70). She contends that Therrian intentionally destroyed audio/video recordings of that incident and of an investigatory interview, both of which would be relevant to her case. As a sanction for this conduct, she asks the Court to enter a default judgment in her favor or, in the alternative, to instruct the jury that it must make an adverse inference about this evidence. For the reasons herein, the Court will deny the motion.

### I. BACKGROUND

**A. Interview**

According to Gertcher, she and Joel Watson were landlords of a house owned by Watson in Dollar Bay, Michigan. On March 8, 2019, she served the tenant of the house with an eviction notice, asking the tenant to leave by April 30. She later received complaints from neighbors that dogs were barking inside the house, and that no one had been there for several days, so she went inside the house to investigate. (Gertcher Dep. 13, ECF No. 70-2.) She gave some water to the dogs and called the tenant's mother.

At some point, the tenant complained to the police that Gertcher and/or Watson had entered the house without permission. On May 2, 2019, Officer Therrian went to the home shared by Gertcher and Watson to interview them. He told them that he was investigating a possible crime and they agreed to speak with him. He interviewed each of them in his squad car, which was parked outside their home.

They showed Therrian an eviction notice and Watson explained that he and Gertcher went to the tenant's house to change the locks and Gertcher went inside to check on the dogs. (Therrian Dep. 25-26, ECF No. 70-3.) After the interviews, Therrian said he would submit the matter to the prosecutor. He promised to "get back with" them to let them know the outcome. (*Id.* at 36-37.)

Therrian recorded these conversations using his body microphone. (*Id.* at 20.) That recording was saved to a SIM card in the video system of his car. (*Id.* at 22.) Per policy, Therrian would have uploaded that recording to the Calumet Post computer system. (*Id.* at 23.)

**B. Arrest**

Therrian submitted a report of his investigation to the prosecutor. On May 7, 2019, he received warrants to arrest Gertcher and Watson. The warrants charged each of them with one misdemeanor count of entry without permission. That evening, Therrian and Houghton County Sherriff's Deputy Anders Kurtti went to Gertcher's home to arrest her and Watson. They arrived at or after 7:20 pm.[1]

Gertcher's excessive force claim against Therrian turns on what happened when Therrian arrested her. The witnesses tell different stories.

---

[1] Therrian's daily log indicates that he located, arrested, and transported Gertcher at 7:20 pm. (ECF No. 70-10, PageID.695.) The next entry is at 9:45 pm. Thus, it is not clear exactly when Therrian and Kurtti arrived or when the arrest occurred.

2

### 1. Therrian's Account

According to Therrian, he knocked on the door to Gertcher's home and Watson answered. Therrian said that he needed to speak with Gertcher and Watson; he did not mention the warrants. (*Id.* at 49, 52.) Kurtti was standing next to him. Watson went back into the house to get Gertcher. Watson returned in less than a minute and stepped outside. He said Gertcher would come out soon. Therrian told Watson about the warrant and put him in handcuffs.

When Gertcher came to the door, she opened it and started yelling at Therrian. She wanted to know why he had put Watson in handcuffs. (Therrian Dep. 56.) Therrian told her about the warrants and she became angry. He asked her to step outside because she was under arrest, but she did not comply. Instead, she tried to close the door. (*Id.* at 58.) Before she could do so, Therrian grabbed her right hand and put his foot in the doorway. She pulled him into the house. He pulled her right arm behind her back, but she continued to resist. Kurtti came inside to assist and grabbed her left arm. (*Id.* at 63-64.) As they were putting her into handcuffs, she complained that she was being hurt. She asked to have the cuffs moved to the front. (*Id.* at 66-67.) Therrian left to take Watson to the station, leaving Kurtti to transport Gertcher.

### 2. Gertcher's Account

According to Gertcher, she was in the bathroom getting changed and brushing her teeth when Watson told her that an officer wanted to speak with her. (Gertcher Dep. 22, ECF No. 70-2.) She finished what she was doing, which took about five to ten minutes, and then went to the front door. (*Id.*) She opened the door carefully because she has two dogs and did not want them to escape. Suddenly, Therrian grabbed her right wrist and jerked her to the right, causing her head to hit the door frame. (*Id.*) He then grabbed her left arm, put it behind her back, and pushed it "up as hard has he could" at the elbow. (*Id.*) She started "screaming" because of the pain and asked him to stop. (*Id.* at 23.) Watson also told Therrian to stop because Gertcher has a "bad shoulder."

3

(*Id.*)  But Therrian put handcuffs on her and tried to knock her to the ground.  (*Id.*)  She fell onto her right knee.  When she stood up, Therrian shoved her into a recliner, holding her arm up behind her back "beyond what it could mechanically do[.]" (*Id.*)  Therrian then brought her outside.  At that point, she asked him to loosen the cuffs because they were so tight that her hands were turning purple.  (*Id.* at 24.)  Instead, he grabbed the cuff on her right wrist and "tightened it up as tight as it could possibly go." (*Id.*)  Watson then asked Therrian to take him to jail first because he did not want Gertcher's 10-year old stepdaughter and grandson to be left alone in the house.  Therrian refused, so Gertcher asked her stepdaughter to run and get Gertcher's daughter-in-law, who lived nearby.

After Gertcher's daughter-in-law arrived, Watson again asked Therrian to take him to the station because he did not want Gertcher alone with Therrian.  After "about five minutes," Therrian agreed and left to take Watson to jail.  (*Id.* at 24.)  Kurtti remained behind and later transported Gertcher to jail.

### 3. Watson's Account

According to Watson, Therrian arrested him and then they waited outside for a few minutes until Gertcher came to the door.  (Watson Dep. 18, ECF No. 70-4.)  Watson says that Gertcher's "head came partially out of the door and was pulled back into the house." (*Id.* at 19.)  Therrian put a handcuff on her right arm and then Watson saw them "wrestling around in the kitchen/living room area." (*Id.*)  Gertcher hit her head on the door frame when Therrian was trying to apply the other handcuff.  (*Id.* at 23.)  When Watson saw Therrian bend Gertcher's arm into an awkward position, Watson tried to tell Therrian that Gertcher "has a bad shoulder." (*Id.* at 24-26.)  Watson heard Gertcher tell Therrian that he was hurting her.  (*Id.* at 30.)  Watson asked Therrian to take him to jail because he thought the situation would "de-escalate" if Therrian was "removed from the situation." (*Id.* at 45.)  Therrian did so.

4

### 4. Kurtti's Account

Kurtti arrived in a separate vehicle from Therrian. He does not remember much about the arrest and did not record it on his body microphone. (Kurtti Dep. 16, 23, ECF No. 75-3.) He recalls that Therrian knocked on the door and Watson answered. (*Id.* at 25-26.) Therrian arrested Watson and put him in handcuffs. Then Therrian knocked on the door again and Gertcher answered. Therrian told her there was a warrant for her arrest but she refused to come out. (*Id.* at 29.) She tried to close the door on Therrian and he grabbed her right arm. (*Id.* at 29.) Therrian then went into the house and tried to put her in handcuffs behind her back. He put a cuff on her right arm and Kurtti put a cuff on the other. (*Id.* at 34.) She was facing away from them, up against the back of a reclining chair. (*Id.* at 36.) He does not recall Gertcher saying that Therrian was hurting her. Therrian took Watson to jail and Kurtti stayed behind. Kurtti took the cuffs off Gertcher and allowed her to change her clothes. Later, he transported her to jail.

### C. Audio/Video of Arrest

There is no existing audio or video of Gertcher's arrest. Therrian and Kurtti did not possess body cameras in 2019; however, they did wear microphones that were connected to the video systems in their vehicles. Kurtti did not record the arrest. Therrian testified that he would have activated his body microphone when he approached Gertcher's house. (Therrian Dep. 47.) Apparently, his vehicle camera was not pointed at Gertcher's house, so it would not have captured a video of the arrest. Nevertheless, his body microphone would have captured audio from the incident, even though he was not in or near his vehicle.

Police records indicate that, on May 18, 2019, Therrian uploaded a video/audio recording from the date of the arrest to the Calumet Post computer.[2] (Chain of Custody Report, ECF No. 70-19, PageID.755.) The recording started at 7:51 pm and ended at 9:06 pm. (*Id.*)

On June 5, 2019, Gertcher's counsel sent an email to the Michigan State Police ("MSP"), asking it to preserve evidence from the arrest. (Email, ECF No. 70-18, PageID.752.) On June 7, 2019, Gertcher's counsel sent a letter to the office of the Houghton County Prosecuting Attorney, asking it to disclose evidence in connection with the charge against Gertcher. (Letter, ECF No. 70-20, PageID.757.)

At 10:01 pm on June 10, 2019, Therrian's supervisor, First Lieutenant Randal Danison, played a portion of the audio/video file in order to review Therrian's use of force. At 10:09 pm, Danison noted:

> I have reviewed all of the reports associated with this incident. There is no in car video of the arrest. I have found that the appropriate level of force was used to take the female suspect, who was displaying active resistance, into custody on a valid arrest warrant.

(Use of Force Report, ECF No. 70-17, PageID.749 (capitalization altered).)

At present, Danison does not recall what was depicted in the recording, except that it did not show Gertcher's arrest. (Danison Dep. 18-19, ECF No. 70-9.) If there had been audio that was relevant, he believes that he would have noted it in his report. (*Id.* at 19.)

The audio/video file was automatically deleted on June 17, 2019. Gertcher's motion turns on what that recording contained and why it was not preserved. According to Danison, different files have different retention schedules. Therrian would have been responsible for assigning the audio/video file an "event ID." (*Id.* at 21.) In this case, he should have labeled it an "arrest,"

---

[2] MSP policy required officers to upload recorded media "at the end of an assigned shift when possible," and in some cases, "every two weeks, or as otherwise directed by a supervisor." (MSP Policy, ECF No. 70-15, PageID.731.)

6

which would have ensured that the file was retained for up to three years rather than 30 days. (*Id.* at 20-21.)

Gertcher contends that the recording would support her excessive force claim and that Therrian and/or Danison intentionally or negligently failed to preserve it.

### D. Audio/Video of Interview

Similarly, there is no existing recording of the investigative interviews conducted by Therrian on May 2, 2019, though it is not clear why that is the case.

## II. ANALYSIS

District courts have broad discretion to craft proper sanctions for the spoliation of evidence. *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2012) ("*Adkins II*").

> When appropriate, a proper spoliation sanction should serve both fairness and punitive functions, but its severity should correspond to the district court's finding after a fact-intensive inquiry into a party's degree of fault under the circumstances, including the recognition that a party's degree of fault may range from innocence through the degrees of negligence to intentionality. Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.

*Id.* at 504 (quoting *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010)).

Gertcher relies on the general standard for imposing spoliation sanctions set forth in *Adkins* and *Beaven* as well as Rule 37(b) of the Federal Rules of Civil Procedure. Under Rule 37(b), the Court can issue a *default judgment* where a party has not obeyed an order "to provide or permit discovery[.]" Fed. R. Civ. P. 37(b)(2)(A). That rule does not apply here because Gertcher does not contend that Therrian failed to obey an order regarding discovery. Indeed, the evidence at issue was apparently destroyed before Gertcher even filed this lawsuit.

Under *Beaven*,

> A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an

7

obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Thus, an adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction. This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction.

*Adkins II*, 692 F.3d at 503-04 (quoting *Beaven*, 622 F.3d at 554).

### A. Obligation to Preserve the Evidence

An obligation to preserve evidence "'may arise when a party should have known that the evidence may be relevant to future litigation[.]'" *Beaven*, 622 F.3d at 553 (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). For purposes of this motion, the Court will assume that Therrian and/or Danison had an obligation to preserve the recordings.

### B. Relevance

Therrian argues that there is no evidence that the recording from May 7 captured the arrest. Therrian argues that he likely arrested Gertcher between 7:20 and 7:30 pm, before the recording started at 7:51 pm. Therrian relies on his police report, which states that he "checked" Gertcher's residence at "approximately 7:30 pm" and then knocked on her door. (Suppl. Incident Report, ECF No. 75-5, PageID.1610.) He also relies upon his daily log report, which indicates that he "locat[ed]," "arrested," and "transported" Gertcher and Watson at 7:20 pm, with the assistance of Kurtti. (Daily Log, ECF No. 70-10, PageID.695.) Neither one of these documents is particularly helpful for identifying the precise time that Therrian attempted to arrest Gertcher. They indicate that her arrest occurred sometime after 7:30 pm, but not much more than that.

Furthermore, according to Therrian's deposition testimony, he would have activated his microphone *before* her arrest. Therrian does not explain why he would have activated a recording

8

at 7:51 pm if the arrest had already occurred.[3] It is more likely that he arrived *later* than 7:30 and activated his microphone at 7:51 as he approached Gertcher's door. Indeed, Therrian's argument requires the Court to assume that he arrested both Watson and Therrian within a span of about 20 minutes, which is possible but unlikely.

Therrian also relies on Danison's use-of-force report, in which Danison stated that there was no "in car video" of the arrest. However, the issue is whether Therrian's microphone captured *audio* of the arrest. Danison's statement does not rule out the existence of audio. Danison also stated at his deposition that if there had been audio that was relevant to Therrian's use of force, he likely would have said so in his report. (Danison Dep. 19.) However, it is unlikely that Danison listened to much audio in the recording, concluded that there was nothing relevant in it, and then transmitted his report within the span of only eight minutes. It is more likely that, once he saw that the *video* did not capture the arrest (perhaps because the camera was not pointed at the house), he concluded that the recording would not be helpful.

In short, if Therrian did activate his microphone before the arrest and create a recording of it, as the evidence before the Court suggests, then that recording likely captured evidence relevant to Gertcher's claim. For instance, audio from the arrest might have revealed whether and to what extent she complained that Therrian's actions or the handcuffs caused her pain. In addition, it might have indicated whether Therrian told her about the arrest warrant and whether she complied with his directions or actively resisted.

In contrast, the Court does not believe that the recording of the interviews on May 2 would have much relevance. It would not shed light on the central issue in this case, which is whether

---

[3] Therrian suggests that the recording showed Watson's transport to jail, but Therrian does not indicate how that recording would have activated.

9

Therrian used excessive force when making his arrest on May 7. Gertcher argues that the May 2 recording would have been relevant to show that she and Watson cooperated with the investigation and had no reason to suspect that they were being investigated for a crime. But that cooperation would also explain her resistance to the arrest. If she thought that she had done nothing wrong, then it is understandable that she would be upset when she and Watson were being arrested. Due to its minimal relevance, no sanctions are warranted for any failure to preserve that recording.

### C. Culpable State of Mind

"The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or *negligently*." *Beaven*, 622 F.3d at 554 (emphasis in original; quotation marks and brackets omitted). Gertcher argues that, at the very least, Therrian was negligent in allowing the audio/video evidence to be destroyed. However, Gertcher fails to grapple with the rule most applicable to these circumstances, which is Rule 37(e) of the Federal Rules of Civil Procedure, not Rule 37(b). Rule 37(e) applies to the failure to preserve "electronically stored information that should have been preserved in the anticipation or conduct of litigation[.]" Fed. R. Civ. P. 37(e). Under that rule, which was amended after *Adkins II* and *Beaven*, the Court can enter default judgment or issue an adverse inference instruction "only upon finding that the party acted *with the intent to deprive another party of the information's use in the litigation*[.]" Fed. R. Civ. P. 37(e)(2). In other words, "a showing of negligence or even gross negligence will not do the trick." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016).

Here, there is not sufficient evidence establishing a specific intent by Therrian or Danison to deprive Gertcher of use of the May 7 recording in this litigation. Indeed, it was destroyed before this litigation commenced. Although Gertcher's counsel attempted to notify the MSP of the need to preserve the recording, there is no evidence that these notices reached Therrian or anyone else

with control over the disposition of the recording.  Therrian notes that Gertcher's counsel sent the preservation request to a defunct email address at the MSP.  (Aldrich Aff. ¶ 5, ECF No. 75-12.)  Similarly, there is no evidence that Gertcher's letter to the prosecutor's office reached the MSP.  Without "notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case and intentional destruction[.]" *Beaven*, 622 F.3d at 553 (quotation marks omitted).  At most, Gertcher has established negligence in the preservation of evidence potentially relevant to this lawsuit, which is not sufficient to warrant a default judgment or an adverse instruction under Rule 37(e).

Even if the Court has *inherent* authority to issue a default judgment or an adverse inference instruction separate and apart from Rule 37(e), the Court does not believe that such extreme sanctions would be appropriate.  Issuing a judgment in Gertcher's favor would not correspond to the degree of Therrian's fault.  Furthermore, a mandatory adverse inference instruction would have much the same effect as a default judgment.  In a case where witnesses tell different stories, requiring the jury to make an adverse inference about the contents of an audio recording would effectively require the jury to infer that the recording depicted Therrian using more force than necessary, tipping the scales decisively in Gertcher's favor.  Those sanctions are not warranted here.

### III. CONCLUSION

In summary, Gertcher's requested sanctions are not warranted.  Accordingly, the Court will deny her motion.

Gertcher has also filed a separate motion asking the Court to permit her expert to access MSP's computers to determine whether the recordings can be recovered.  The Court has referred that motion to the magistrate judge and leaves it to the magistrate judge's discretion to decide.

An order will enter consistent with this Opinion.

Dated:  March 22, 2022                           /s/ Hala Y. Jarbou
                                                                  HALA Y. JARBOU
                                                                  UNITED STATES DISTRICT JUDGE